RENDERED: APRIL 27, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0479-MR

DONNIE CAMPBELL                                                                                      APPELLANT


ON APPEAL FROM ADAIR CIRCUIT COURT
V.             HONORABLE JUDY VANCE MURPHY, JUDGE
NO. 20-CR-00090


COMMONWEALTH OF KENTUCKY                                                          APPELLEE


**OPINION OF THE COURT BY JUSTICE CONLEY**

**AFFIRMING IN PART, REVERSING IN PART**

An Adair Circuit Court jury found Donnie Campbell guilty of first-degree assault, first-degree robbery, and violating a domestic violence order (DVO). The jury also found Campbell to be a persistent felony offender in the first degree and recommended a sentence of life imprisonment, which the trial court then imposed. Campbell appeals to this Court as a matter of right.[1] He claims the trial court erred because it: Allowed testimony via Zoom; permitted the Commonwealth's witness to testify despite a purported discovery violation; failed to strike a juror for cause; refused to grant a mistrial; and failed to grant a directed verdict on first-degree assault and first-degree robbery. Campbell further contends the Commonwealth committed prosecutorial misconduct

---

[1] Ky. Const. § 110(2)(b).

during closing argument. Finally, Campbell urges this Court to overturn his conviction based on cumulative error. We find the trial court committed error when it permitted a witness to testify via Zoom and hold that error requires reversal of the conviction of assault in the first-degree but affirm the Adair Circuit Court on the remaining convictions and the resultant life sentence.

## I. FACTS AND PROCEDURAL HISTORY

Felicia Woolridge had an intimate relationship with Campbell for approximately three years, and eventually, Campbell came to reside with her at her home on Pinetree Street in Columbia. In December of 2019, Felicia obtained a domestic violence order (DVO) against Campbell. Campbell then moved out of her residence and left Columbia entirely.

After Campbell left, Felicia began a friendship with Michael Smith. Felicia denied that she and Smith were involved romantically but when Campbell returned in May of 2020, he did not want them talking anymore. Felicia acquiesced because she wanted to work things out with Campbell. Both men became jealous of one another, and after several serious physical confrontations transpired between Campbell and Smith, it escalated to the matter currently before this Court.

On May 22, 2020, Smith came home from work and was relaxing at his home. He had recently gotten paid and had approximately $170 on his person. He was sitting in a chair and listening to music when he noticed someone walk by his window. At first, he thought it was his brother. He was suddenly struck on his shoulder and fell to the floor. He saw it was Campbell holding a steel

2

pipe standing over him. Smith played dead while Campbell beat him several times with the weapon and took his wallet and left.

When he was sure that Campbell had fled, he ran to his landlord Billy Wheat's house for help. Billy called for an ambulance and when Chad Wheat, (no relation) the emergency medical technician (EMT) arrived, he saw that Smith was covered in blood and had lost consciousness for approximately forty-five seconds. EMT Wheat also observed that Smith had numerous lacerations and a one square inch chunk of flesh missing from his head where he could see Smith's skull.[2] Smith also had a large swelling on the back of his neck. He was transported to the local hospital where a computerized topography (CT) scan of his head and neck was administered. The CT scan discovered his cervical spine was fractured. Melissa Snead, a registered nurse (RN), sutured the lacerations but was unable to do so for the avulsion on the back of his head. Smith had to be transported to the University of Kentucky's Medical Center because it was determined he required further treatment at the trauma center there.

EMT Wheat drove the ambulance that transported Smith to Lexington. While enroute, Smith experienced a severe drop in blood pressure. When it registered at 66/40, Wheat pulled the ambulance over to administer fluids in order to stabilize Smith. When they arrived at the University of Kentucky

---

[2] Dr. Tucker, mentioned below, diagnosed this as an avulsion and described it as if part of Smith's scalp was scooped out.

Medical Center the swelling on the back of Smith's neck was the size of a softball.

While at UK, Smith was treated by Dr. Brian Tucker. Dr. Tucker diagnosed Smith as having a fractured skull located at the back of his head, a concussion, a hematoma and swelling on the back of his head and neck, a cervical spine fracture, broken nose, and an avulsion on the back of his head.

Campbell was arrested at Felicia's house shortly after the 911 call was made. On June 25, 2020, an Adair County grand jury indicted Campbell for assault in the first-degree, robbery in the first-degree, violation of a domestic violence order and being a persistent felony offender in the first-degree. After a two-day trial the jury convicted Campbell on all counts and recommended a sentence of life imprisonment. The circuit court accepted the recommendation of the jury and sentenced Campbell accordingly. Further facts will be adduced as necessary. We now discuss the merits of the appeal.

## II.    ANALYSIS

First, Campbell argues the trial court erred by permitting a witness to testify via Zoom which violated his rights under the Confrontation Clause of the 6th Amendment of the United States Constitution.[3] Secondly, he claims the trial court erred by not excluding expert testimony because of the Commonwealth's purported discovery violation. Next Campbell claims that during voir dire the trial court erred by failing to grant the defense motion to

---

[3] Campbell did not argue at trial, nor does he here claim any violation of his right of confrontation under Section 11 of the Kentucky Constitution.

4

strike a juror for cause. Campbell also argues the trial court ought to have granted a mistrial upon motion of the defense when Smith claimed he was at risk of being paralyzed. Campbell further argues that the trial court erred by not granting a directed verdict on both the assault in the first-degree and robbery in the first-degree. Campbell also contends the Commonwealth committed prosecutorial misconduct during closing arguments and finally, Campbell argues that the errors in this case require reversal under the cumulative error doctrine.

### A. The trial court erred by allowing Dr. Tucker to testify via Zoom which requires reversal of the assault in the first degree conviction.

Campbell argues that the trial court erred by allowing Dr. Tucker to testify via Zoom in violation of his right of confrontation afforded by the 6th Amendment of the U.S. Constitution. Dr. Tucker's testimony about the extent of Smith's injuries was relevant to prove Smith sustained a serious physical injury,[4] an essential element of assault in the first degree.[5] Campbell preserved this issue by making contemporaneous objections.

On the morning of trial, the Commonwealth informed the court and Campbell's attorney that it would have Dr. Tucker testify remotely via Zoom. As justification the Commonwealth stated Dr. Tucker was scheduled to work that

---

[4] KRS 500.080 (17): "'Serious physical injury' means physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ."

[5] KRS 508.010: "A person is guilty of assault in the first degree when: (a) He intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument[.]"

day at the hospital and would be unable to travel to Adair County, a distance of approximately one hundred miles. Although neither party addresses it, we note Dr. Tucker's subpoena is dated August 11, 2021, and he was served on the 18th of August, only one day prior to his scheduled testimony.[6]

Evidentiary rulings by the trial court are reviewed for abuse of discretion. *Anderson v. Commonwealth,* 231 S.W.3d 117, 119 (Ky. 2007). The test for abuse of discretion is whether the trial court's ruling was arbitrary, unfair, unreasonable or unsupported by sound legal principles. *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

The Sixth Amendment to the United States Constitution guarantees the accused in all criminal prosecutions the right to be "confronted with the witnesses against him." U.S. Const. amend. VI. This right of confrontation is also enshrined in Kentucky's Constitution that guarantees "in all criminal prosecutions the accused has the right . . . . to meet the witnesses face to face." Ky. Const. §11. Courts have long recognized that the right of confrontation is one of the "fundamental guaranties of life and liberty[.]" *Kirby v. United States*, 174 U.S. 47, 55 (1899). And the primary purpose of which is to compel the witness "to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242–43 (1895).

---

[6] The trial began on August 18, 2021.

At times courts have grappled with issues on the application of the Sixth Amendment right of confrontation. Courts have had to decide, for instance, whether certain rules admitting hearsay evidence conflicted with the right of defendant to confront witnesses against them. The United States Supreme Court in *Ohio v. Roberts* was faced with the issue of whether testimony given during a preliminary hearing was admissible at trial. 448 U.S. 56 (1980). They held the Sixth Amendment merely expressed a preference for face-to-face confrontation. *Id.* at 65. The Court in *Roberts* reasoned that defendants' confrontation rights must occasionally give way to competing interests of "public policy and the necessities of the case." *Id.* at 64 (citing *Mattox v. United States*, 156 U.S. at 243). Thus, hearsay was permitted as long as it was firmly rooted in a hearsay exception or bore a "sufficient indicia of reliability." *Id.* at 66.

The idea that confrontation rights, as guaranteed by the Sixth Amendment, required "balancing" with competing interests of public policy led courts to weigh the rights of the accused against the state's interest in protecting child sex abuse victims from re-traumatization by their purported abuser. The U.S. Supreme Court, reversing the Iowa Supreme Court, held that a screen placed between the two thirteen-year-old victims and the defendant violated his right of confrontation. *Coy v. Iowa*, 487 U.S. 1012 (1988). As part of its reasoning the Court commented that:

> [F]ace-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached

by a malevolent adult. It is a truism that constitutional protections have costs.

*Id.* at 1020. However, two years later the Court upheld a different method that sought to avoid re-traumatization of a minor sex-abuse victim. In a Maryland case, a state statute allowed a minor to testify via a one-way closed-circuit monitor. *Maryland v. Craig,* 497 U.S. 836, 840 (1990). Under this procedure the child, the prosecutor, and the defense counsel retired to a different room, while the judge, jury, and the defendant remained in the courtroom. *Id.* at 841. In a 5-4 ruling the U.S. Supreme Court held that a defendant's right of confrontation is not absolute and a "[s]tate's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Id.* at 853. The Court explained that there must be an adequate showing of necessity on a case specific basis. *Id.* at 855. The Court even went so far as to opine that face-to-face confrontation, while a core constitutional value is not the "sine qua non[7] of the confrontation right." *Craig,* 497 U.S. 836 at 847.

Central to the Court's holding in *Craig* is that it was based upon its understanding of the confrontation clause as articulated by *Ohio v. Roberts,* 497 U.S. 836 (1990). This approach allowed courts to balance competing interests of "public policy and the necessities of the case." *Id.* at 64 (citing

---

[7] "Sine qua non" is defined as Latin for "without which not. A thing that is absolutely indispensable or essential." Black's Law Dictionary (2nd ed. 1910).

*Mattox*, 156 U.S. at 243). This conception of the Confrontation Clause was lambasted by Justice Scalia in his dissent in *Craig.* He argued that:

> The Court supports its antitextual conclusion by cobbling together scraps of dicta from various cases that have no bearing here. It will suffice to discuss one of them, since they are all of a kind: Quoting *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980), the Court says that "[i]n sum, our precedents establish that 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,'" *ante,* at 3165. (emphasis added by the Court). But *Roberts,* and all the other "precedents" the Court enlists to prove the implausible, dealt with the *implications* of the Confrontation Clause, and not its literal, unavoidable text.

*Craig,* 497 U.S. at 863 (Scalia, J., dissenting). He roundly condemned the balancing test promulgated under *Roberts* and *Craig,* stating "[f]or good or bad, the Sixth Amendment requires confrontation, and we are not at liberty to ignore it." *Id.* at 870. His dissent foreshadowed the latter majority opinion he authored in *Crawford v. Washington,* 541 U.S. 36, 61 (2004).

*Roberts* is now overruled by *Crawford v. Washington. Id.* In *Crawford,* the Court reversed itself by holding that the Sixth Amendment does not merely express a preference for face-to-face confrontation, rather, "[i]t commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id. Crawford* rejected the replacement of "categorical constitutional guarantees with open-ended balancing tests . . ." *Id.* at 67-68. And "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

9

And yet, almost twenty years after *Crawford, Maryland v. Craig,* remains "good law." 497 U.S. 836, 853 (1990). The U.S. Supreme Court has not dealt with the inherent contradiction between *Crawford* and *Craig.* But a Sixth Circuit, U.S. Court of Appeals decision upheld a conviction that utilized the procedure as authorized by *Craig* in *United States v. Cox,* 871 F.3d 479 (6th Cir. 2017), *cert. denied,* 138 S.Ct. 754 (Mem) (2018). Judge Sutton in a separate concurrence wondered how *Craig* can "survive in the absence of the *Roberts* balancing test?" *Id.* at 494 (Sutton, J., concurring). Because, he opined, "*Craig* relied heavily, indeed almost entirely, on *Roberts* to justify its decision." *Id.* at 492.

The courts in this Commonwealth have also been reluctant to address the contradiction between *Craig* and *Crawford.* In a case decided four years after *Crawford,* this Court in *Sparkman v. Commonwealth,* 250 S.W.3d 667 (Ky. 2008), ruled it was error to allow the Commonwealth to utilize the procedures under KRS 421.350[8] where the Commonwealth failed to demonstrate a compelling need. *Id.* at 670. Nonetheless, we held it was harmless and ultimately upheld the conviction. *Id.* at 671. Nowhere in this Court's analysis in *Sparkman* do we address the latent incongruity of relying on *Craig* in the wake of the decision in *Crawford.*

There are some recent unpublished cases where the Court of Appeals and this Court weighed in on the issue of using two-way video conferencing,

---

[8] KRS 421.350 is entitled "Testimony of child allegedly victim of illegal sexual activity."

i.e., Zoom, during the pandemic. As such, the facts are similar to the issues presented in this case but have yielded somewhat inconsistent results. The Court of Appeals upheld a trial court's decision[9] which overruled the Commonwealth's motion to use Zoom technology to permit a witness to testify for trial because he was located at a federal correctional facility in Manchester, Kentucky. *Gardner v. Commonwealth,* No. 2020-CA-1383-MR, 2021 WL 3573304 (Ky. App. Aug.13, 2021). The Court of Appeals panel analyzed the case under *Craig* and reasoned that the Commonwealth failed to demonstrate a compelling need. *Id.* at *4.

This Court was faced with a similar issue when a defendant objected to the use of Zoom teleconferencing during his sentencing hearing. *Gibson v. Commonwealth,* No. 2020-SC-0250-MR, 2021 WL 3828558 (Ky. Aug. 26, 2021). Gibson was initially charged with murder after stabbing three people and killing one of them. He had entered a plea agreement to second-degree manslaughter and two counts of second-degree assault. The recommended sentence was twenty years. *Id.* at *1. At the sentencing hearing, held on May 4, 2020, the trial court utilized Zoom and sentenced him according to the terms of the plea agreement. *Id.* We upheld the decision of the lower court under *Craig's* rationale. *Id.* at *4. This Court also pointed to our own administrative orders allowing testimony via Zoom. *Id.* Our decision in *Gibson* and our decision here can be reconciled by pointing out the present case involved a jury trial in August of 2021 after the worst of the pandemic had receded and courts were

---

[9] The hearing was held on October 7, 2020.

functioning more or less normally; conversely Gibson's sentencing hearing took place right at the beginning of the pandemic in May of 2020 when courts were severely curtailed in their normal functioning. Also, at a sentencing hearing, the trial court is the finder of fact and the court did not depart from the sentence voluntarily agreed upon by both the defendant and the Commonwealth. *Id.* at *1.

This Court does not have the authority to overrule the United States Supreme Court's decision in *Craig.* And because Campbell failed to argue that his Section 11 rights of confrontation under the Kentucky Constitution were violated, we will not use this opportunity to depart from federal precedent. Therefore, as Judge Sutton explained in his concurring opinion in *United States v. Cox, "Craig* governs us here, as junior courts may not overrule the handiwork of their superiors." 871 F.3d at 492.

In the present case, Dr. Tucker testified remotely via Zoom for Campbell's trial. We are unable to determine the audio-visual quality of the Zoom testimony the jury enjoyed, but upon review of the record Dr. Tucker appears in the lower right quadrant of the screen and the visual is blurry and fragmented. The other three quadrants are filled by the judge, the prosecutor, and the defense attorney. It does not appear Dr. Tucker could view either the appellant or the members of the jury when he testified to the extent of Smith's injuries and course of treatment at the University of Kentucky's Medical Center. The Commonwealth argued that Dr. Tucker needed to testify via Zoom because he was needed at the hospital and could not travel to Adair County to

be present at the trial.  Again, we note this trial took place at the tail end of the pandemic in August of 2021.  The Commonwealth urges this Court to accept that this supports a finding of necessity as contemplated by *Craig.*

But the Commonwealth's reliance on *Craig* is misplaced.  The witnesses in *Craig* were victims of sexual abuse and were minors at the time of their testimony.  Those procedures were put in place to protect them from the potential of traumatization by confronting, and being confronted by, the perpetrator of said crimes. This was found necessary because there was no other way for the children to testify without the attendant psychological impact of being in the physical presence of the defendant.  Here, we have what amounts to a scheduling difficulty between the Commonwealth and Dr. Tucker, which was likely caused by the belated issuance of the subpoena. While this could have been remedied with a continuance, it was certainly not a matter of necessity.

Appellees also point to the administrative orders from this Court encouraging the use of zoom for remote testimony. In the relevant order we state that **"[c]ourts are encouraged to continue hearing civil and criminal matters using available telephonic and video technology to conduct proceedings remotely**." Supreme Court of Kentucky Amended Administrative Order 2021-27 (B)(1). The administrative orders from this Court were intended to encourage the use of remote technology within the context of the parties' constitutional rights. The orders from this Court never purported to replace the U.S. Constitution or the Kentucky Constitution but rather must be interpreted

13

within those frameworks. There are many proceedings which could be contemplated under this order. For instance: criminal motion hour, routine hearings, a trial in which a defendant waives a confrontation issue because his right to a speedy trial is more important to him. However, in this instance, we are dealing with a jury trial where the defendant was facing a considerable amount of jail time and the Commonwealths' expert witness testimony was crucial in proving a key element of the assault charge. The defendant, understandably, objected to the Zoom testimony of the doctor and insisted on a face-to-face confrontation which was countered by the Commonwealth with the argument the doctor was too busy to comply with the subpoena.[10] Clearly this situation does not comply with *Crawford*, but neither does it comply with *Craig.* There was no showing of necessity, other than convenience to the doctor, or balancing of a victim's interests that justified the surrender of the Defendant's constitutional rights of confrontation. Thus, by allowing Dr. Tucker to testify via Zoom as a convenience to him, the trial court erred.

Since we have determined that there is a confrontation clause error we must decide "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction . . . or put otherwise, that error was harmless beyond a reasonable doubt." *Talbott v. Commonwealth,* 968 S.W.2d 76, 84 (Ky. 1998) (citing *Chapman v. California,* 386 U.S. 18, 23, 24 (1967)). The U.S. Supreme Court has held that:

> An assessment of harmlessness cannot include consideration of
> whether the witness' testimony would have been unchanged, or

---

[10] The record indicates that Dr. Tucker testified from home and not the hospital.

the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence.

*Coy*, 487 U.S. at 1021–22. Dr. Tucker's testimony was relevant to whether Campbell was guilty of assault in the first-degree. The Commonwealth, in order to obtain a conviction, was required to prove beyond a reasonable doubt that Smith had sustained a serious physical injury. Serious physical injury is defined by KRS 500.080 (17), the relevant portion of which states:

> "Serious physical injury" means physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ.

Dr. Tucker's testimony conveyed to the jury the extent of the injuries suffered by the victim. During his testimony he frequently referred to Smith's medical records, which were also admitted as evidence. He noted that Smith suffered a fracture of the third vertebrae of his cervical spine (C3) and multiple fractures of the C6. Dr. Tucker also stated that there was a fracture to the base of his skull, a concussion, a swelling on the base of his skull, and the aforementioned avulsion. On cross-examination, Campbell was able to elicit that Smith did not require a blood-transfusion nor was he intubated. Dr. Tucker conceded that Smith did not require surgical intervention and he appeared alert and oriented.

The Commonwealth had other witnesses that testified to the extent of Smith's injuries. EMT Wheat testified Smith lost consciousness for almost a minute, his extensive bleeding, and the large hole located in the rear of his head that exposed a portion of Smith's skull. When EMT Wheat transported

Smith to Lexington, he had to stop the ambulance and administer fluids because his blood pressure became dangerously low. The Commonwealth introduced photographs of the crime scene which showed a substantial amount of blood on the floor and the portion of the exposed skull. Melissa Snead, a registered nurse, testified that the results of the CT scan showed fractures of the C3 and C5 vertebrae of the cervical spine. The Commonwealth also introduced the certified medical records from the University of Kentucky and T.J. Sampson Hospital in Columbia, where Smith was initially taken.

These records, and records from Smith's follow-up appointment were reviewed by Dr. William Ralston, the Commonwealth of Kentucky's Chief Medical Examiner who testified on behalf of the appellant. Dr. Ralston testified that upon review of Smith's medical records he concluded that Smith was not likely to die from the wounds he received. He based his conclusion primarily on the lack of intra-cranial bleeding which is more commonly associated with risk of death. He did note that Smith sustained multiple fractures of the neck, nose and a fracture at the base of the skull. This is consistent with the testimony of Dr. Tucker. Campbell also called Dr. Kiteck who saw Smith for a follow up appointment on July 20, 2020, approximately five weeks after the assault, to remove the staples from his head. He noted no other complications from the attack. At trial, Smith testified that he still suffered from stiffness of his neck and hears a popping sound when he turns his head.

Considering all the testimony given by all the witnesses, this Court cannot be confident that the trial court's decision to allow a doctor to testify

16

remotely, on an essential element of the Commonwealth's case, is harmless beyond a reasonable doubt. And because there is a reasonable possibility his testimony contributed to the guilty verdict on the charge of assault in the first-degree, we reverse the judgment of the Adair Circuit Court on that charge.

### B. The trial court did not err by refusing to grant a directed verdict on robbery in the first-degree.

Campbell argues the trial court erred by not granting his motion for a directed verdict on robbery in the first degree. Campbell claims that Smith's testimony was the only evidence at trial to support a conviction for robbery and his testimony was too unreliable to defeat a motion for a directed verdict on that charge. This Court has previously stated that:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991). The standard of review for an appellate court on reviewing a lower court's decision regarding a directed verdict is, "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then is a defendant entitled to a directed verdict of acquittal." *Id.*

The jury convicted Campbell of robbery in the first-degree. Robbery in the first-degree is defined by KRS 515.020(1) which states as follows:

> A person is guilty of robbery in the first degree when, in the course of committing theft, he or she uses or threatens the immediate use

17

of physical force upon another person with intent to accomplish the theft and when he or she: (a) Causes physical injury to any person who is not a participant in the crime; or (b) Is armed with a deadly weapon; or (c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.

Smith testified that Campbell used a steel rod to strike him repeatedly and thus caused at the very minimum, physical injury. Smith also testified it was Campbell who rolled him over and stole his wallet. Smith's testimony was uncontroverted at trial. Since Smith admitted to using alcohol and marijuana that evening, Campbell argues, his testimony should be disregarded as unreliable. Campbell also claims Smith's credibility was tarnished because he was less than forthright about his cocaine usage. At trial, Smith did not admit to using cocaine that evening or the previous week even though cocaine metabolites were found in his system at the hospital. Additionally, Campbell argues the Commonwealth ought to have tested the wallet for fingerprints or the presence of Campbell's DNA to corroborate Smith's testimony.

Campbell urges this Court to apply *Collinsworth v. Commonwealth*, 476 S.W.2d 201, 202 (Ky. 1972), a case regarding circumstantial evidence and directed verdicts. But the application of *Collinsworth* here is unwarranted despite Campbell's mischaracterization of Smith's testimony as circumstantial evidence. It is not. Additionally, Smith's testimony was corroborated by the numerous injuries he sustained as a result of the attack. Ultimately it is the jury that makes determinations as to a witness's credibility. *McDaniel v. Commonwealth*, 415 S.W.3d 643, 654 (Ky. 2013). The jury here heard the evidence, and it was not clearly unreasonable that they determined Campbell

18

committed the offense of robbery in the first-degree. The trial court did not commit error by failing to grant a directed verdict.

## C. The trial court did not abuse its discretion by failing to strike juror 353 for cause.

Campbell argues that, by failing to strike juror 353, the trial court violated his right to an impartial jury. At trial, Campbell moved to strike juror 353 because of statements she made to the court as detailed below. Defendants are entitled an impartial jury as guaranteed by Section 11 of the Kentucky Constitution and by the Sixth and Fourteenth Amendments to the U.S. Constitution. *Fugett v. Commonwealth,* 250 S.W.3d 604, 612 (Ky. 2008). The Kentucky Rules of Criminal Procedure provide that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." RCr 9.36(1). A trial court's decision on whether to strike a juror for cause lies within the sound discretion of the trial court. *Ordway v. Commonwealth,* 391 S.W.3d 762, 780 (Ky. 2013). Upon review, an appellate court will not reverse the trial court's decision unless it is an abuse of discretion or clearly erroneous. *Id.* The trial court's decision on whether to strike a juror should be made "on the totality of the circumstances, not on a response to any one question." *Fugett v. Commonwealth,* 250 S.W.3d 604, 613 (Ky. 2008). Should a trial court abuse its discretion in its failure to strike a juror for cause, the error cannot be said to be harmless and requires reversal. *Shane v. Commonwealth,* 243 S.W.3d 336 (Ky. 2007). This issue is preserved by Campbell.

19

Campbell's objection to juror 353 is based on her disclosure to the court that her father had suffered a severe injury that exposed a portion of his bone in his leg. The juror admitted she gets anxious when she sees blood. This, Campbell claims, would cause her to evaluate any injury at issue on a purely emotional basis rather than according to the evidence presented at trial. Campbell also claims this juror's squeamishness would cause her to be reluctant to view any pictures of injuries in this case. This sensitivity to this type of injury does not amount to a type of bias but rather is a normal human reaction. Jurors are expected to evaluate evidence in all kinds of tragic and highly emotionally charged cases and there is no requirement an impartial jury be comprised of stonily impassive jurors.

Campbell also claims juror 353 ought to have been stuck for cause because she informed the court her mother-in-law and sister-in-law are nurses. She stated to the court she found nurses to be credible on medical issues and would likely believe a nurse over a lay witness on medical issues. But she added, she would not believe a nurse over a lay witness over something not medically related. Juror 353 merely stated she finds people with medical experience and training better able to evaluate and diagnose medical issues better than somebody without any medical experience or training. This has little to do with members of her family being part of the nursing profession. Campbell's argument would be stronger if juror 353 declared a nurse had more credibility over a doctor or other medical professional but she did not. Further, Campbell's claims of bias only relate to the issue of serious physical injury and

since we have overturned the first-degree assault conviction, Campbell's claims of juror bias are without merit here. Hence, the trial court did not abuse its discretion by refusing to strike juror 353.

**D. Campbell's remaining claims of error**

Campbell has six remaining claims of error. They are (1) that the trial court erred when it failed to exclude Dr. Tucker from testifying because of a purported discovery violation, and (2) failed to grant Campbell's motion for mistrial, (3) and the trial court's failure to grant a directed verdict on the charge of assault in the first degree, (4) and purported prosecutorial misconduct during closing arguments.

Campbell's remaining convictions do not require reversal under the cumulative error doctrine under *Brown v. Commonwealth* as we have found no further errors. 313 S.W.3d 577, 631 (Ky. 2010). As for the remainder of Campbell's claims, any alleged errors the trial court may have made relate solely to Campbell's conviction on assault in the first-degree. These are now moot since we have reversed the judgment of the trial court on the conviction of assault in the first-degree.

### III. CONCLUSION

Based on the foregoing, we hereby reverse the judgment of conviction on the charge of assault in the first-degree but affirm the Adair Circuit Court on the conviction of robbery in the first-degree, violating a domestic violence order, and being a persistent felon in the first-degree and his resultant sentence of life

imprisonment. We now remand to the trial court for proceedings consistent with this opinion.

All sitting. VanMeter, C.J.; Bisig, Keller, and Nickell, JJ., concur. Thompson, J., concurs by separate opinion. Lambert, J., concurs in result only by separate opinion.

THOMPSON, J., CONCURRING: I write separately to emphasize that as to the issue regarding violation of the Confrontation Clause by having the doctor testify remotely, it is the Commonwealth Attorney who is at fault for causing this reversal. This emergency room doctor, located one-hundred miles away from the trial venue, was served with a subpoena the day before the trial. This is intolerable. It is unrealistic to expect such a witness to be able to arrange to attend a trial in person with such short notice.

Adequate preparation for a trial must include issuance of subpoenas to doctors as soon as practical after the trial date is set. Doctors and other professionals deserve the courtesy of the judicial branch of our government and while other witnesses may not require quite as much notice, all witnesses may have other commitments they will need to rearrange to attend court. The majority opinion should serve as a warning that the defendant's right to confrontation will not be set aside where the failure of a witness to personally appear is caused by the Commonwealth's failure to act with all prudent diligence.

LAMBERT, J., CONCURRING IN RESULT ONLY: I fully agree with the majority's adoption of the two-part *Maryland v. Craig*[11] test to determine whether a criminal defendant's Confrontation Clause rights have been violated when a witness testifies via two-way video conferencing. I further agree that *Craig*'s requirements were not met in this case. However, I would hold that the trial court's error in permitting Dr. Tucker to testify via Zoom in this case was harmless error. Notwithstanding, I concur in the result of Campbell's first-degree assault conviction being vacated because I believe the trial court committed reversible error in failing to grant Campbell's motion for directed verdict for that offense. I therefore concur in result only.

To begin, I agree that the trial court erred by allowing Dr. Tucker to testify via two-way video conferencing because doing so violated Campbell's confrontation clause rights. I further agree with the majority's conclusion that *Craig* is the proper test to apply when the Commonwealth seeks to have a witness testify using two-way video conferencing. Despite the ongoing debate concerning whether *Craig* can survive in a post-*Crawford v. Washington*[12] world, the United States Supreme Court has yet to explicitly overrule *Craig* and it therefore remains good law. And, although the United States Supreme Court has yet to address the application of the Confrontation Clause within the context of two-way video conferencing, nearly all of the federal circuit courts apply *Craig* to determine whether a witness' testimony via two-way video

---

[11] 497 U.S. 836 (1990).
[12] 541 U.S. 36 (2004).

violated a criminal defendant's right to confrontation.[13]  It is also worth noting that *Craig* has been applied by the federal circuits in cases wherein the witness to testify by two-way video was not an alleged victim of child sex abuse.[14]

Under *Craig,* "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured."[15]  And, "[t]he requisite finding of necessity must. . . be a case-specific one: The trial court must hear evidence and determine whether use of the [two-way video conferencing] is necessary to [serve the important public policy]."[16]

In this case, during an in chambers discussion on the morning of the first day of trial, the Commonwealth represented to the trial court that Dr. Tucker could not be physically present because he was scheduled to work in an emergency room in Lexington, and could not get his shift covered to make the four to five hour round trip to Adair County.  The Commonwealth made it seem as though Dr. Tucker took care of COVID patients, noting this Court's

---

[13] *See U.S. v. Cotto-Flores*, 970 F.3d 17, 25 (1st Cir. 2020); *U.S. v. Abu Ali*, 528 F.3d 210, 242 (4th Cir. 2008); *Horn v. Quarterman*, 508 F.3d 306, 319 (5th Cir. 2007); *U.S. v. Weekley*, 130 F.3d 747, 753 (6th Cir. 1997); *U.S. v. Protho*, 41 F.4th 812, 827 (7th Cir.); *U.S. v. Bordeaux*, 400 F.3d 548, 554 (8th Cir. 2005); *U.S. v. Carter*, 907 F.3d 1199, 1206 (9th Cir. 2018); *U.S. v. Carrier*, 9 F.3d 867, 869 (10th Cir. 1993); and *U.S. v. Yates*, 438 F.3d 1307, 1313 (11th Cir. 2006).  It appears the Third Circuit has yet to opine on the issue, and the Second Circuit remains an outlier in its holding that *Craig* does not apply to two-way video testimony based on its reasoning that two-way video preserves the face-to-face confrontation absent in the one-way video system used in *Craig.  See United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999).

[14] *See Abu Ali,* 528 F.3d at 241; *Horn*, 508 F.3d at 313; and *Yates*, 438 F.3d at 1315.

[15] *Craig*, 497 U.S. at 850.

[16] *See id.* at 855.

approval of video conferencing in response to COVID. The trial court seemed to take this representation on faith and ruled that Dr. Tucker was "a busy ER doctor in the middle of a COVID pandemic who's stepping away from patients on respirators." While accommodating a COVID physician could potentially be an important public policy to be served, there is nothing concrete in the record to support this assertion. According to Dr. Tucker's own testimony, he is an emergency room trauma surgeon who sees severely injured emergency room patients. He testified that it was a busy time of the year for trauma until the weather gets cold but said nothing of being overwhelmed with COVID patients. He made no representations whatsoever that he was actively treating COVID patients, or that his schedule could not be worked around because of his work treating COVID patients. Dr. Tucker's CV is not included in the record on appeal and was not provided to the defense until the morning of the second day of trial.

Accordingly, as I understand the majority to hold that the Commonwealth did not make an adequate showing of necessity under *Craig*, I agree that allowing Dr. Tucker to testify via two-way video conferencing was error. But I submit this error was harmless. "Confrontation clause errors are subject to a harmless error standard of review. Before a federal constitutional error can be held harmless, the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt."[17] An error is considered

---

[17] *See, e.g.*, *Quist v. Commonwealth*, 338 S.W.3d 778, 782 (Ky. App. 2010) (internal citation and quotation marks omitted).

25

harmless if it appears beyond a reasonable doubt that the error did not contribute to the verdict obtained.[18]  While I ultimately assert that there was insufficient evidence of serious physical injury, assuming arguendo that the evidence was sufficient, Dr. Tucker's testimony was cumulative when considered alongside the other evidence as to Smith's injuries.  I would therefore argue that its omission would not have changed the outcome beyond a reasonable doubt, rendering it harmless.  A recitation of the evidence of Smith's injuries is necessary.

Smith testified that on the evening of Friday, May 22, 2020, he was sitting in a chair in his home when Campbell gained entry and struck him on the left shoulder.  Smith fell to the floor and Campbell continued to beat him with what Smith described as a "steel pipe" about his head and neck.  Smith said he "played dead" until Campbell stopped beating him and left.  Smith was then able to, according to his own words, jump up, go out his front door, jump over the railing on his porch, run across the street and through a field until he got to his landlord's house who he told to call 911.  Photographs of the two large lacerations on the back and side of his head were admitted during his testimony.  He testified that the wounds required staples that were later removed, and that apart from scarring he does not have any issues with those injuries.  Smith further testified that he was kept at UK Hospital for approximately forty-eight hours and was given a neck brace to wear upon discharge.  He stated that he sometimes wears the neck brace when he sleeps,

---

[18] *See, e.g., Stewart v. Commonwealth*, 306 S.W.3d 502, 508 (Ky. 2010).

and when he does not his neck becomes stiff and "pops." However, during cross-examination he acknowledged that he has not sought any additional medical care for his neck, that he did not have any follow up care after the attack other than having his staples removed, and that he has continued to work detailing cars.

Chad Wheat, the paramedic that responded to Smith's landlord's house, testified that when he arrived Smith's head and shirt were covered in blood and that he had multiple lacerations on his head. Of note was a "one inch by one inch hole" on the back of Smith's head that was deep enough that Wheat could see his skull. As Wheat began to bandage Smith's head, he became unresponsive for forty-five seconds to a minute, and then woke up again. As Wheat was transporting Smith to a local hospital, T.J. Samson Community Hospital, Smith's blood pressure began to gradually drop. When Smith's blood pressure reached 66/40, Wheat administered a saline IV and Smith's blood pressure stabilized within twenty minutes. On cross-examination, Wheat testified that no other medical treatment was rendered: Smith did not require resuscitation, a blood transfusion, intubation, etc.

Melissa Snead, a registered nurse at T.J. Samson, treated Smith when he arrived. His medical records from that hospital were admitted during her testimony. His records noted lacerations above his left eyebrow, behind his left ear, and on the back of his head. CT scans of Smith's head and neck that were conducted upon his arrival revealed he had factures in two of his cervical vertebrae. She stated he was transferred to UK Hospital approximately two

27

hours after his arrival at T.J. Samson because he required a higher level of care than they could provide.

Dr. Tucker testified that he was Smith's treating physician when he arrived at UK on Saturday, May 23 between midnight and 1:30 a.m., and Smith's medical records from UK were introduced through him. In addition to the two cervical spine fractures already discussed by nurse Snead, Dr. Tucker further testified that Smith's CT scan revealed a skull fracture to his occipital condyle, i.e., the back lower portion of his head. He also noted that the larger laceration on Smith's head was considered an avulsion, which he described as the tissue being "scooped out." But notably, no surgical intervention was recommended or required for any of his injuries. There was no mention of him being placed in the ICU or other elevated care unit. Instead, Smith was kept for observation for about forty-eight hours and was then released and instructed to wear the neck brace for three months. Again, he required no surgeries, no blood transfusion, no intubation, nor any other medical treatment apart from what has already been described.

For its part the defense called Dr. William Ralston, the Chief Medical Examiner for the Commonwealth who also provides private consultation on forensic pathology and expert testimony. Dr. Ralston reviewed Smith's ambulance reports, his T.J. Samson records, and his UK medical records. He discussed each of the injuries Smith sustained at length. In particular, the two lacerations to his head, his occipital condyle fracture, and the two fractures in his cervical spine. He discussed that it was possible that the avulsion could go

28

back to its original form, but it was also possible that it would leave a permanent indentation and scar. He opined that none of Smith's injuries were "immediately life threatening" based on the treatment he received: he reasoned that no life-saving intervention occurred and that his records do not indicate that he was at risk of dying at any point. He further opined that nothing in the medical records indicated that Smith's day to day life would have been affected apart from wearing his neck brace.

The defense also called Dr. Clinton Kiteck who removed Smith's staples on July 2, 2020, less than two months after the attack. Dr. Kiteck stated that Smith reported no issues with his injuries other than wanting his staples removed.

Again, assuming arguendo that the evidence was in fact sufficient to support a first-degree assault conviction, I submit that if Dr. Tucker had never testified at trial the outcome would have been no different. Evidence of the large lacerations that Smith sustained came in through Smith himself, paramedic Wheat, nurse Snead, and Dr. Ralston. Evidence of Smith's cervical vertebrae fractures were discussed by Nurse Snead and Dr. Ralston. And Smith's occipital condyle fracture was discussed by Dr. Ralston. There's simply nothing Dr. Tucker testified to regarding Smith's injuries that was not also discussed by other witnesses. I would therefore hold that the trial court's error in allowing him to testify via zoom was harmless.

Instead, I submit that the reversible error committed by the trial court in relation to Campbell's first-degree assault charge was its failure to grant a

29

directed verdict based on the Commonwealth's lack of proof that Smith sustained a serious physical injury as that term is defined by statute.[19] "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal."[20]

In order to convict Campbell of first-degree assault, the Commonwealth had to prove that "[Campbell] intentionally [caused] serious physical injury to [Smith] by means of a deadly weapon or dangerous instrument."[21] Serious physical injury is defined in relevant part as "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ."[22] Importantly, "[w]hen determining whether a defendant caused a serious physical injury, the issue is not whether there was proof of an act that **could** cause serious physical injury. The issue is whether there was proof of an act that **did**, in fact, cause serious physical injury."[23]

---

[19] This error was properly preserved: the defense moved for a directed verdict at the close of the Commonwealth's evidence and at the close of all the evidence. It specifically argued that the Commonwealth failed to prove first-degree assault because Smith's injuries failed to meet the statutory definition of serious physical injury. *See Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020).

[20] *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

[21] KRS 508.010(1)(a).

[22] KRS 500.080(17).

[23] *Anderson v. Commonwealth*, 352 S.W.3d 577, 581 (Ky. 2011) (internal quotation marks omitted) (emphasis added).

To begin, there was no evidence that Smith's injuries created "a substantial risk of death." The only medical treatment he received was the administration of IV fluids, staples to close the two large lacerations on his head, and a neck brace to be worn for three months. The evidence was undisputed that neither his cervical spine fractures nor his occipital condyle fracture required surgery or further treatment other than wearing his neck brace. He was kept for observation over a weekend and was back to work six days later.

Although Smith sustained some blood loss, he only ever lost consciousness for about a minute when paramedic Wheat arrived and began to treat him. None of the medical professionals testified that his blood loss amount was life threatening; indeed, no blood transfusion was required. In addition, while his blood pressure dropped to 66/40 while being transported to T.J. Samson, paramedic Wheat testified and the ambulance report reflects, that it was a gradual and steady drop in blood pressure that was remedied quickly with a saline IV. He required no other medical treatment, and the only follow up medical treatment he received was removal of the staples from his head wounds.

Likewise, there was insufficient evidence that his injuries caused "serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ." The Commonwealth points to the large scar left on Smith's head from the laceration described as an avulsion and Smith's discussion of his neck issues as proof of this

31

requirement. I disagree. In *Anderson*, the defendant cut the victim's jawline with a straight razor, leaving a scar.[24] This Court held that "[w]hile the scar on [the victim's] jaw does constitute a disfigurement, it is not of sufficient severity to support a finding of 'serious physical injury' under the second prong of KRS 500.080[(17)], which requires not merely disfigurement, but 'serious and prolonged' disfigurement."[25] If a large scar left across a victim's face does not constitute serious and prolonged disfigurement, a presumably[26] large scar left on the back of a victim's head cannot be said to constitute serious and prolonged disfigurement either.[27]

And, while substantial prolonged pain can constitute a serious physical injury,[28] there was no evidence that Smith suffered from such pain. Smith stated that if he does not sleep in his neck brace, his neck gets stiff and will "pop." But he has never sought any additional medical treatment for his neck, and he was able to return to work less than a week after the attack.

While I am loath to in any way minimize the horrible nature of this senseless attack on Smith or his resulting injuries, KRS 500.080(17) "sets a

---

[24] *Id.* at 580.

[25] *Id.* at 582.

[26] There is no evidence of record regarding what the scar looks like. Instead, Smith showed the back of his head to the jury at the Commonwealth's request.

[27] *Cf. Jones v. Commonwealth,* 737 S.W.2d 466, 468 (Ky. App. 1987) (holding that loss of an eye constituted "serious and prolonged disfigurement ... or prolonged loss or impairment of the function of any bodily organ" sufficient to prove serious physical injury).

[28] *Parson v. Commonwealth,* 144 S.W.3d 775, 787 (Ky. 2004) (holding that "pain is an 'impairment of health.' If the pain is substantial, but not prolonged, it constitutes a 'physical injury;' but if it is prolonged, then it is a 'serious physical injury.'").

fairly strict level of proof which must be met by sufficient evidence of injury,"[29] and it simply was not met in this case. I would therefore hold that the trial court reversibly erred by overruling the defense's motion for directed verdict on the charge of first-degree assault. But, for the reasons stated herein, I would hold that the trial court's error in permitting Dr. Tucker to testify remotely was harmless error.

COUNSEL FOR APPELLANT:

Molly Mattingly
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Stephanie L. McKeehan
Assistant Attorney General

---

[29] *Anderson*, 352 S.W.3d at 581 (internal quotation marks omitted).